## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

KAYLA HENDRICKS, on behalf of )
D.C.H., a minor child, )
                             )
        Plaintiff, )
                             )
v. )           **Case No. CIV-22-611-STE**
                             )
KILOLO KIJAKAZI, Acting Commissioner )
of the Social Security Administration, )
                             )
        Defendant. )

## MEMORANDUM OPINION AND ORDER

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of the Social Security Administration denying Plaintiff's application for benefits under the Social Security Act. The Commissioner has answered and filed a transcript of the administrative record (hereinafter TR. ____). The parties have consented to jurisdiction over this matter by a United States magistrate judge pursuant to 28 U.S.C. § 636(c).

The parties have briefed their positions, and the matter is now at issue. Based on the Court's review of the record and the issues presented, the Court **AFFIRMS** the Commissioner's decision.

## I.    PROCEDURAL BACKGROUND

This case involves an application for Supplemental Security income filed by Ms. Hendricks, on behalf of her minor son, D.C.H., alleging a disability based on D.C.H.'s critical coarctation of the aorta, a congenital heart defect ("CHD"), which was diagnosed

shortly after he was born on September 6, 2008. (TR. 193-198). Plaintiff initially filed for benefits for D.C.H. on July 20, 2015. *See* TR. 11. An administrative hearing was held and on September 26, 2017, the Administrative Law Judge (ALJ) issued an unfavorable decision. (TR. 11-24). The Appeals Council denied Plaintiff's request for review and Ms. Hendricks filed an appeal in federal court. (TR. 1-4, 520-522). On October 26, 2022, the Northern District of Oklahoma reversed and remanded the Commissioner's decision. (TR. 525-533).[1]

On remand, a second administrative hearing was held and the Commissioner issued a second unfavorable decision. (TR. 441-497). Subsequently, the Appeals Council denied Plaintiff's request for review,[2] making the ALJ's decision the final decision of the Commissioner.

## II.    DETERMINATION OF DISABILITY FOR CHILDREN

The Social Security Act provides that "[a]n individual under the age of 18 shall be considered disabled . . . if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(I).

---

[1]  Following the remand order from the Northern District, the Appeals Council remanded the case for a second administrative hearing. *See* TR. 536. In doing so, the Appeals Council noted that Plaintiff had filed a subsequent claim for disability benefits on January 22, 2020 and ordered the ALJ on remand to consolidate the two claims. *See id*.

[2]  (TR. 428-430).

2

The Commissioner applies a three-step sequential inquiry to determine whether an individual under the age of 18 is disabled. *See* 20 C.F.R. § 416.924(a). At step one, the ALJ determines whether the child is engaged in substantial gainful activity. *Id.* at § 416.924(b). If not, the inquiry continues to step two for consideration of whether the child has a severe medically determinable impairment(s). *Id.* at § 416.924(c). If so, step three involves determining whether such impairment meets, medically equals, or functionally equals a listed impairment. *Id.* at § 416.924(d). A child's impairment functionally equals an impairment if it is "of listing-level severity; *i.e.*, it must result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain[.]" *Id.* at § 416.926a(a), (d). A child will be found "not disabled" if the impairment does not: (1) meet the twelve-month duration requirement or (2) meet, medically equal, or functionally equal a listed impairment. *Id.* at § 416.924(d)(2).

## III.   THE RELEVANT LISTINGS

The relevant listing associated with D.C.H.'s CHD and asthma, are found at Listings 104.06 and 103.03 for Congenital Heart Disease and Asthma, respectively. Listing 104.06 provides:

> Congenital heart disease, documented by appropriate medically acceptable imaging (see 104.00A3d) or cardiac catheterization, with one of the following:
>
>> A.   Cyanotic heart disease, with persistent, chronic hypoxemia as manifested by:
>>
>>> 1.   Hematocrit of 55 percent or greater on two evaluations 3 months or more apart within a consecutive 12-month period (see 104.00A3e); or

2.     Arterial O2 saturation of less than 90 percent in room air, or resting arterial PO2 of 60 Torr or less; or

3.     Hypercyanotic spells, syncope, characteristic squatting, or other incapacitating symptoms directly related to documented cyanotic heart disease; or

4.     Exercise intolerance with increased hypoxemia on exertion.

OR

B.     Secondary pulmonary vascular obstructive disease with pulmonary arterial systolic pressure elevated to at least 70 percent of the systemic arterial systolic pressure.

OR

C.     Symptomatic acyanotic heart disease, with ventricular dysfunction interfering very seriously with the ability to independently initiate, sustain, or complete activities.

Listing 104.06.[3]

Listing 103.03 provides:

Asthma. With:

A.     FEV1 equal to or less than the value specified in table I of 103.02A; Or

B.     Attacks (as defined in 3.00C), in spite of prescribed treatment and requiring physician intervention, occurring at least once every 2 months or at least six times a year. Each inpatient hospitalization for longer than 24 hours for control of asthma counts as two attacks, and an evaluation period of at least 12 consecutive months must be used to determine the frequency of attacks; Or

---

[3] Listing 104.06 also has a subsection D, but that subsection is irrelevant as it only applies to claimants under 1 year of age.

      C.     Persistent low-grade wheezing between acute attacks or absence of extended symptom-free periods requiring daytime and nocturnal use of sympathomimetic bronchodilators with one of the following:

          1.     Persistent prolonged expiration with radiographic or other appropriate imaging techniques evidence of pulmonary hyperinflation or parabronchial disease; or

          2.     Short courses of corticosteroids that average more than 5 days per month for at least 3 months during a 12-month period; Or D. Growth impairment as described under the criteria in 100.00.

Listing 103.03.

## IV.  THE ADMINISTRATIVE DECISION

The ALJ followed the three-step sequential evaluation process established for minor children as set forth in 20 C.F.R. §416.924(a). At step one, the ALJ found that D.C.H. had never engaged in substantial gainful activity. (TR. 442). At step two, the ALJ concluded that D.C.H. suffered from the following severe impairments: status post coarctation of the aorta; status post end to end anastomosis repair; asthma/allergic rhinitis; attention deficit hyperactivity disorder; a learning disorder; and a reading disorder. (TR. 442). At step three, the ALJ considered Listings 104.060 (congenital heart disease) and 103.03 (asthma) concluded that D.C.H. did not have an impairment that met or medically equaled either of these listed impairments. (TR. 443). At step three the ALJ also evaluated the six domains to determine whether D.C.H.'s impairments functionally equaled a listed impairment. (TR. 444-452).

In doing so, the ALJ concluded that D.H. had a "less than a marked" limitation in the domains of: (1) acquiring and using information; (2) attending and completing tasks; (3) moving about and manipulating objects; and (4) health and physical well-being. (TR. 445). The ALJ also concluded that D.C.H. had no limitation in the domains of: (1) interacting and relating with others; and (2) the ability to care for himself. (TR. 445). Accordingly, the ALJ concluded that D.C.H's impairments did not functionally equal a listed impairment. (TR. 452). Ultimately, the ALJ concluded that D.C.H. was not disabled, because his impairments did not meet, equal, or functionally equal a listed impairment. (TR. 452).

## V.   STANDARD OF REVIEW

This Court reviews the Commissioner's final decision "to determin[e] whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied." *Wilson v. Astrue*, 602 F.3d 1136, 1140 (10th Cir. 2010). Under the "substantial evidence" standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "Substantial evidence … is more than a mere scintilla … and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. at 1154 (internal citations and quotation marks omitted).

While the court considers whether the ALJ followed the applicable rules of law in weighing particular types of evidence in disability cases, the court will "neither reweigh

the evidence nor substitute [its] judgment for that of the agency." *Vigil v. Colvin*, 805

F.3d 1199, 1201 (10th Cir. 2015) (internal quotation marks omitted).

## VI.   ISSUES PRESENTED

Plaintiff alleges that the ALJ erred in considering: (1) certain evidence which she

deems relevant to the ALJ's step three findings; (2) the opinion of medical expert, Dr.

Gutierrez-Santiago; and (3) the consistency of Plaintiff's subjective statements. (ECF

No. 18:4-15).

## VII.   THE ALJ'S CONSIDERATION OF EVIDENCE RELATED TO THE LISTINGS

As stated, at step three, the ALJ considered Listings 104.060 (for congenital

heart disease) and 103.03 (for asthma) and concluded that D.C.H. did not have an

impairment that met, medically equaled, or functionally equaled either of these Listings.

(TR. 443-452). In doing so, Plaintiff argues that the ALJ failed to consider certain

evidence relevant to finding that D.C.H.: (1) met or equaled a listed impairment and/or

(2) functionally equaled a listed impairment. (ECF No. 18:6-11, 15). The former is

based on medical factors alone and specific criteria outlined in each Listing. *See* 20

C.F.R. § 416.924(d). The latter is based on evaluating the severity of a child's

functioning in six domains. *See id.* at § 416.926a(a), (d). The Court considers each

argument in turn and rejects both of Plaintiff's challenges.

Regarding Plaintiff's challenge to the ALJ's conclusion that D.C.H. did not meet or

equal a Listed impairment, Plaintiff states:

> Dr. Guitterrez-Santiago [sic], relying on a one-time finding when
> Claimant's pressure gradient was assessed at his lowest of 14 mmHg,

assessed Claimant's coarctation as "a past history of CHD" and "status post repair." Such testimony demonstrates no knowledge of the long-term sequelae of coarctation of the aorta. This includes the fact that the shape of Claimant's aorta alone can cause chest pain and shortness of breath. In this case, *no* analysis was provided to the objective evidence in the record regarding Claimant's complex CHD, including his large pressure gradient causing pressure disparity between his legs and head, tortuous aorta, pulmonary stenosis causing restricted blood flow to his lungs, and ventricular hypertrophy. The pressure disparity can be seen, as mentioned *supra,* in Claimant's four blood pressure values. Such hemodynamics are known to cause fatigue, shortness of breath, cough, and chest pain caused by hypertension leading to recurrence, stroke, aneurysm, and other cardiac events in this CHD. Nonetheless, here, both Dr. Guitterrez-Santiago [sic] and the reviewing physicians failed to look at any relevant medical evidence in the record when analyzing Claimant's CHD.

. . .

The reviewing physicians only provided one relevant measurement when analyzing Claimant's CHD, stating his pressure gradient had improved from 25 to 14 mmHg. This ignores that Claimant's pressure gradient was 25 mmHg in the first place. Second, the reviewing physicians state Claimant takes no cardiac medications in support of their findings. However, aortic coarctation is treated with stenting and angioplasty and this finding is irrelevant to the condition. The agency's cardiovascular listing itself notes conclusions about the severity of a cardiovascular impairment cannot be made on the basis of type of treatment rendered or anticipated given that the amount of function restored varies with the nature and extent of the disorder. Listing 104.00G2. According to the agency's own listings, Claimant suffers from a symptomatic acyonotic (defined as a heart defect where the heart contains enough oxygen, yet the blood is being pumped abnormally), however, neither the reviewers nor Dr. Guitterrez-Santiago [sic] analyze or examine how Claimant's blood is being pumped or how it has affected him during the time at issue. Listing 104.06C. Both opinions are simply unsupported, *especially* given that no objective evidence exists that Claimant suffers from asthma. *See* Listing 140.00B3a *stating* the agency bases its evaluation on the current objective medical evidence. Here, only objective evidence supporting Claimant's severe cardiac impairment.

. . .

Here, no agency medical expert analyzed Claimant's limitations as a symptomatic acyonotic defect with measurements showing severe pulmonary stenosis, high blood pressure causing ventricular hypertrophy, and peak gradient measurements ranging as high as 44 to 64 mmHg during the time at issue. No expert considered this objective evidence as causing Claimant's symptoms despite the agency's own listings specifically listing coarctation of the artery as an acyonotic defect that causes limitations and ventricular dysfunction due to impaired blood flow, *supra.* Throughout the entire time at issue, Claimant has never had normal measurements, *supra,* with his best mean gradient indicating he had only demonstrated *minimal* improvement to his hemodynamics and pressure while still suffering from shortness of breath and indicating future surgery. Likewise, Claimant was generally found restricted by his fatigue.

(ECF No. 18:6-9) (internal citations omitted).

Apparently, Plaintiff believes that the State Agency physicians and Dr. Gutierrez-Santiago erred in failing to consider certain evidence which Plaintiff deemed relevant to determining whether D.C.H. met or equaled a Listed impairment, and that the ALJ erred, in turn, because he had adopted the opinions of the State Agency physicians and Dr. Gutierrez-Santigo. To the extent the Court understands Plaintiff's argument, the Court rejects it, because Plaintiff never explains how D.C.H.'s pressure gradient, blood flow, long-term sequelae of coarctation, pressure disparity, or lack of medication, would have resulted in a finding that Claimant had met or equaled a Listing. *See supra*, Listings; *see also Mays,* 739 F.3d 569, 576 (declining to consider arguments that were not adequately developed); *accord Murrell v. Shalala,* 43 F.3d 1388, 1389 n. 2 (10th Cir. 1994) (noting that "perfunctory complaints" failing "to frame and develop an issue" are not "sufficient to invoke appellate review"); *Keyes–Zachary,* 695 F.3d at 1161 (declining to consider issues not adequately briefed for review). Plaintiff argues that

9

"[s]uch hemodynamics are known to cause fatigue, shortness of breath, cough, and chest pain caused by hypertension leading to recurrence, stroke, aneurysm, and other cardiac events in this CHD," but Plaintiff never states that such was the case with D.C.H. or that these symptoms would somehow result in a finding that he met or equaled a Listing.

Regarding Plaintiff's challenge to the ALJ's conclusion that D.C.H. did not functionally equal a Listed impairment, Plaintiff takes issue with the ALJ's evaluation of the six domains, wherein she found that D.H. had:

- A "less than a marked" limitation in the domains of acquiring and using information; attending and completing tasks; moving about and manipulating objects; and health and physical well-being; and

- No limitation in the domains of interacting and relating with others; and the ability to care for himself.

(TR. 445). Plaintiff challenges the ALJ's findings with regard to three domains—the ability to move and manipulate objects, the ability to care for himself, and the ability to acquire and use information. (ECF No. 18:8, 10).

With regard to the domain involving Plaintiff's ability to move and manipulate objects, Plaintiff states:

> Here, the ALJ accepted an opinion that Claimant suffered from "less than marked" limitations in the ability to move and manipulate objects, despite acknowledging testimony Claimant became short of breath with minimal exercise and could not tie his shoes. This domain evaluates difficulties with moving at an efficient pace around the neighborhood and difficulties with fine motor movements. *SSR* 09-1p.

(ECF No. 18:8). Plaintiff apparently believes that D.C.H.'s shortness of breath and difficulty tying his shoes should have resulted in a finding that he has greater limitations in this domain. But this argument is nothing more than an attempt to re-weigh the evidence, which this Court cannot do. *See supra*, *Vigil v. Colvin*, 805 F.3d at 1201 (noting that the Court may "neither reweigh the evidence nor substitute [its] judgment for that of the agency.") (internal quotation marks omitted).[4]

With regard to the domain involving Plaintiff's ability to care for himself, Plaintiff states:

> Likewise, [the ALJ] adopted an opinion Claimant had no limitations in the ability to care for himself because he had a "history" of surgery and suffered from "no symptoms" of shortness of breath and treated this with "treatment with allergy medication." *Id.* This opinion ignored not only known long-term sequelae of this complex CHD but failed to evaluate signs and symptoms in the record, measurements from the record, and *all* objective medical findings from it, *supra*.

(ECF No. 18:8-9).[5]

While Plaintiff's argument is difficult to discern, she appears to be criticizing the ALJ's rationale for her findings in this domain, and believes the ALJ failed to consider certain evidence in her evaluation of the same. But for two reasons, the Court rejects

---

[4] Plaintiff also argues that in this domain "no analysis regarding [D.C.H.'s] CHD or its effect on his motor skills exists." (ECF No. 18:15). But Plaintiff does not explain how D.C.H.'s CHD would have affected this domain and the Court will not entertain Plaintiff's undeveloped argument. *See supra*.

[5] Plaintiff also argues that the ALJ erred in adopting Dr. Guitierrez-Santiago's opinion regarding this domain because the physician "did not analyze Claimant's significant aneurysm dangers in conjunction with his impulsivity and ADHD symptoms." (ECF No. 18:15). But the "risk" of having an aneurysm is purely speculative and the Court finds no error based on Gutierrez-Santiago's failure to testify regarding the same.

Plaintiff's argument. First, the ALJ did not rely on Plaintiff's history of surgery and allergy medication as rationales for her findings in this domain. Instead, the ALJ adopted the findings of Dr. Gutierrez in this regard and stated: "In caring for himself, [Dr. Gutierrez] found the claimant had no limitations based on his age. She noted he reported no difficulties sleeping and he eats a good diet." (TR. 444) (citation omitted). And second, to the extent Plaintiff believes the ALJ had ignored "long-term sequelae of this complex CHD" and "signs and symptoms in the record, measurements from the record, and *all* objective medical findings from it," Plaintiff never explains how such findings are either relevant to this domain or would result in a different conclusion, nor does she detail specific evidence which she believes would support her position. The Court rejects Plaintiff's argument.

Finally, with regard to the domain involving D.C.H.'s ability to acquire and use information, Plaintiff argues that the ALJ erred in failing to consider evidence relating to D.C.H.'s: (1) IQ of 78, (2) difficulty in understanding instructions, and (3) service plan which was put in place in his school in December 2020. (ECF No. 18:10). Relatedly, Plaintiff also argues that Dr. Gutierrez-Santiago failed to consider Plaintiff's ability to learn, read, write, and do simple math prior to issuing her opinion that Plaintiff had a "less than a marked limitation" in this domain. (ECF No. 18:10). For two reasons, the Court rejects Plaintiff's arguments.

First, the ALJ did consider Plaintiff's IQ, difficulty in understanding instructions, and school service plan. *See* TR. 448 (ALJ noting that "[i]n addition, associated with his

12

application for disability, the claimant underwent a consultative psychological evaluation on October 22, 2015. Wechsler Intelligence Scale for Children—Fourth Edition (WISC-IV) testing revealed a full scale IQ of 78, placing the claimant in the borderline range of intellectual functioning. . . . On Letter-Number sequencing testing the claimant had difficulty understanding the instructions to the task."); TR. 447 (ALJ noting "[i] addition, more recently, some education records were submitted reflecting the claimant has a Student 504 education plan. Therein, his noted areas of need are learning, reading, concentrating and thinking. Records indicate the claimant would receive some reasonable accommodations to be successful in the general education curriculum including small group testing; separate location; text to speech built into online testing; simplifications/repetitions/signage of directions; and frequent breaks. In addition, the plan noted the claimant should be asked to repeat and explain instructions; allow extra time for oral/written response; provide frequent feedback; explain directions in detail as needed; and give assignments which must be copied from the chalkboard or from other sources of written material.").

Second, Plaintiff alleges that Dr. Gutierrez-Santiago failed to consider Plaintiff's "ability to learn, read, write, and do simple math" opinion prior to issuing her opinion, which the ALJ ultimately adopted. The Court views this challenge as an allegation that the ALJ's finding in this domain lacked substantial evidence because the ALJ adopted the opinion of Dr. Gutierrez-Santiago regarding this domain, and she, in turn had not based her opinion on the entire record. The Court rejects this argument however, as Dr.

Gutierrez-Santiago testified that in her review of the evidence, she had considered D.C.H.'s school service plan, which outlined his abilities and limitations in the aforementioned areas. *See* TR. 469, 689-691.

In sum, the Court rejects Plaintiff's challenges to the ALJ's consideration of certain evidence in evaluating whether D.C.H. met, equaled, or functionally equaled a listed impairment.

## VIII.  THE ALJ'S EVALUATION OF THE MEDICAL EXPERT'S OPINION

Plaintiff challenges the ALJ's evaluation of opinions offered by medical expert, Dr. Gutierrez-Santiago. (ECF No. 18:6-8).

At the administrative hearing, following a review of D.C.H.'s case file, medical expert Dr. Guiterrez-Santiago testified regarding her opinion of D.C.H.'s health. (TR. 470-476). Dr. Gutierrez-Santiago first testified that Plaintiff suffered from congenital heart disease and asthma, but that neither of those conditions met or equaled a listed impairment. (TR. 470-471). Dr. Gutierrez-Santiago next examined the six domains and determined that D.C.H.'s impairments did not functionally equal a listed impairment. (TR. 471-473). Ultimately, the ALJ accorded "significant weight" to Dr. Guiterrez-Santiago's opinions, finding that they were consistent with the totality of evidence and supported by specific objective evidence. (TR. 451). In a disjointed fashion, Plaintiff alleges legal error in the ALJ's consideration of Dr. Gutierrez-Santiago's opinion. (ECF No. 18:5-11). The Court rejects Plaintiff's argument.

**A.    Governing Legal Standards for Evaluation of Dr. Gutierrez-Santiago's Opinion**

Regardless of its source, the ALJ has a duty to evaluate every medical opinion in the record. *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004); 20 C.F.R. § 416.927. The weight given each opinion will vary according to the relationship between the claimant and medical professional. *Hamlin*, 365 F.3d at 1215. For example, in evaluating a treating physician's opinion, the ALJ must follow a two-pronged analysis. First, the ALJ must determine, then explain, whether the opinion is entitled to controlling weight. *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004). This analysis, in turn, consists of two phases. First, an ALJ must consider whether the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and consistent with other substantial evidence in the record. Policy Interpretation Ruling Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions, 1996 WL 374188, at 2 (July 2, 1996) (SSR 96-2p) (internal quotations omitted).

If controlling weight is declined, or there is no treating physician's opinion given controlling weight, the ALJ must assess the opinion under a series of factors which are considered when assessing *any* medical opinion, regardless of its source. These factors include: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the

15

area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion. *Krausner v. Astrue,* 638 F.3d 1324, 1330 (10th Cir. 2011); 20 C.F.R § 404.927.[6]

### B. No Error in the ALJ's Evaluation of Dr. Gutierrez-Santiago's Opinion

Ms. Hendricks alleges the ALJ committed legal error in evaluating Dr. Gutierrez-Santiago's opinion. (ECF No. 18:5-11). In doing so, Plaintiff states:

> Dr. Guitterrez-Santiago [sic] has no treating relationship with Claimant. Aside from this, she is not a pediatric cardiologist, or even a practicing pediatrician. When asked to testify regarding Claimant's complex CHD, she was unable to name it or even its related repair. She further was unable to list the number of surgeries Claimant endured. *Id.* When providing testimony, she was unable to name a single measurement relevant to Claimant's condition, including Claimant's current pressure gradient, noted by his mother as still high at 17 mmHg. Given her irrelevant testimony and credentials, and even her lack of current pediatric practice, the ALJ failed to give a single reason as to why she relied on her testimony and findings.

(ECF No. 18:5-6).

---

[6] As stated, two applications for disability benefits are at issue—Plaintiff's original application which was filed in 2015 and the subsequent application filed in 2020. *See supra*. Ordinarily, for applications filed before March 27, 2017, the ALJ's review of medical opinions would be governed by 20 C.F.R. § 416.927. *See* 20 C.F.R. § 416.924a(1) (2015). For claims filed after March 27, 2017, the controlling law for evaluation of medical opinions in child disability cases is 20 C.F.R. § 416.920c. *See* 20 C.F.R. §416.924a (2022). Under the revised regulations, the Commissioner is no longer required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)[.]" 20 C.F.R. § 416.920c(a). Instead, the ALJ need only articulate how persuasive he finds the medical opinion. *See* 20 C.F.R. § 416.920c(b). Here, however, the ALJ considered Plaintiff's 2015 and 2020 applications concurrently, under the old regulations, *see* TR. 442, presumably because the Appeals Council had deemed Plaintiff's second application a "duplicate." *See* TR. 442, 536. The parties do not dispute the applicability of the "old" regulations as controlling. *See* ECF Nos. 18 & 24.

Generally, the opinions of non-examining doctors are given less weight than those of examining doctors, but that does not mean opinions of medical advisors are entitled to no weight. *See Talbot v. Heckler,* 814 F.2d 1456, 1463 (10th Cir. 1987) (reports of reviewing doctors given less weight than those of examining doctors). Moreover, the regulations expressly allow the ALJ to ask for and consider opinions from medical experts on the nature and severity of the claimant's impairments and whether the impairments equal the requirements of a listed impairment. *See* 20 C.F.R. 416.927(e)(2)(iii). In considering such an opinion, the ALJ is bound by the aforementioned rules to evaluate medical opinions. *See supra*; *see also* 20 C.F.R. § 416.927(e)(2)(3). Generally speaking, the more consistent the expert's opinion is with the record as a whole, the more weight the ALJ must give to that opinion. *See* 20 C.F.R. 416.927(c)(3). Here, Plaintiff does not allege that the ALJ failed to consider any of the relevant factors, *see supra*, only that Dr. Gutierrez-Santiago was somehow not qualified to render an opinion because she had no treating relationship with D.C.H. and was not his pediatrician. But the fact that Dr. Gutierrez-Santiago was not Plaintiff's physician or even a pediatrician is irrelevant to her ability to testify as a non-examining medical source.

Plaintiff also alleges that the ALJ "failed to give a single reason as to why she relied on [Dr. Gutierrez-Santiago's] testimony and findings," but that assertion is simply wrong. In evaluating Dr. Gutierrez-Santiago's opinions, the ALJ stated:

> Further, Jessica Guiterrez-Santiago, M.D., appeared at the hearing
> and testified that, after reviewing available evidence, the claimant did not

meet or equal any of the applicable medical listings. In addition, with regard to functional limitations, she opined the claimant has less than marked limitations in acquiring and using information. In support of same, she noted the claimant had psychological testing which revealed a full scale IQ score of 78/borderline intellectual functioning; only slight problems in this domain indicated in a teacher's questionnaire; a 2018 well child checkup indicating his school performance was below average; a 2020 well child checkup indicating no grade retention; and he has a 504 plan at school with no further psychological testing noted in the record. (Exhibits 5F/3, 5E, 13F/50, 14F/7, 27E). As for attending and completing tasks, she also found a less than marked limitation. In support of same, she cited a 2015 teacher questionnaire indicating slight problems; attention described as often a problem in Vanderbilt assessment by teacher; no medications at last well child checkup; and a 504 plan with accommodations, including extra time, frequent feedback and explaining directions in detail. (Exhibit 5E/10, 24E, 14F, 27E).

In the third domain, interacting and relating to others, she found the claimant had no limitations. In support of same, she noted the teacher questionnaire from 2015 noted only slight problems; the Vanderbilt assessment from a teacher noted behavioral issues were generally never or occasionally a problem; and there is no behavioral intervention plan or significant behavioral notes on the chart. (Exhibits 5E, 24E). As for moving about and manipulating objects, she also found the claimant to have less than marked limitations. In noting same, she stated the claimant had a history of shortness of breath with exercise and takes albuterol 30 minutes before exercise. (Exhibit 13F/36). In caring for himself, she found the claimant had no limitations based on his age. She noted he reported no difficulties sleeping and he eats a good diet. (Exhibit 14F). In the last domain, health and physical well being, she opined the claimant had less than marked limitations. In support of same, she stated the claimant has a history of congenital heat [sic] disease, status post surgery and stent placement (October 2016); however, he has been primarily stable since with no medication, hospitalizations or emergency room visits. Since January 2018, he has not had significant symptoms of chest pain, dizziness, syncope, palpitations, shortness of breath, and/or cyanosis. In March 2019, he was stable with no activity restrictions. He had an echocardiogram at that time that revealed normal intracardiac anatomy and normal ventricular function. He also has a mild history asthma, but conservative treatment with allergy medicine albuterol. He has an overweight BMI. (Exhibit 10F) In conclusion, she noted the claimant has

> two chronic medical conditions and they cause limitations; however, they
> are generally stable and do not cause marked or extreme limitations.

(TR. 443-444). After determining that D.C.H. had not engaged in substantial gainful activity, the remaining inquiries involved whether D.C.H. suffered from a severe impairment and whether his severe impairment(s) met, equaled, functionally equaled a listed impairment. *See supra*. Dr. Gutierrez-Santiago testified regarding the same, providing evidentiary support for her testimony, as cited by the ALJ. *See* TR. 443-444, 470-476. Thus, the Court rejects Plaintiff's contention that the ALJ "failed to give a single reason as to why she relied on [Dr. Gutierrez-Santiago's] testimony and findings" and that Dr. Gutierrez-Santiago's testimony was "irrelevant." Dr. Gutierrez-Santiago's testimony was extraordinarily relevant to determining whether D.C.H. suffered from a disability, the physician provided rationales in support of her findings, and the ALJ in turn, relied on the same.

Plaintiff argues that Dr. Gutierrez-Santiago "was unable to name" Plaintiff's heart condition, its related repair, or "a single measurement relevant to Claimant's condition, including Claimant's current pressure gradient, noted by his mother as still high at 17 mmHg." (ECF No. 18:5-6). But at the administrative hearing, Plaintiff's counsel made no such inquiry, instead, only asking Dr. Gutierrez-Santiago about D.C.H.'s heart murmur, for which she demonstrated significant knowledge in explaining that he currently exhibited no symptoms stemming from the murmur. (TR. 473-474). In the future, Dr. Gutierrez-Santiago explained, D.C.H. could develop symptoms, not owing to the

murmur, but because of a "re-stricture" of the area where D.C.H. had a stint implanted to keep open one of his main heart vessels. (TR. 473-474).

Plaintiff also argues that the ALJ erroneously relied on Dr. Gutierrez-Santiago's characterization of D.C.H.'s CHD as "stable," presumably arguing otherwise by citing "three heart surgeries, including a recent angioplasty that only minimally improved his mean gradient to 17 mmHg by March 2019." (ECF No. 18:6). The records that Plaintiff cites in support are found at 391 and 698. Page 391 reflects a visit in 2016 which indicates that D.C.H.'s CHD was "status post-repair" which will "likely need balloon and stent placement in the future and to follow closely. If pressure gradient remains high he would recommend a repeat catheterization with stent of the descending aorta yet the narrowing has stayed stable." (TR. 391). This record did not indicate that Plaintiff's CHD was not "stable." Page 698 reflects a follow-up study for D.C.H.'s CHD, showing:

1.  There is a history of a coarctation of the aorta status post surgical repair and stent placement. A mild residual coarctation of the aorta is present.

2.  Trivial tricuspid and pulmonary insufficiency, not clinically significant.

3.  Normal biventricular size and function.

(TR. 698). Plaintiff argues that "additional surgery is required once this measurement reaches 20 mmHg." (ECF No. 18:6). But Plaintiff has offered no evidence that D.C.H. has needed an additional surgery, and the Court cannot find anything in this record that would indicate that D.C.H.'s CHD was not "stable."

20

Based on the forgoing, the Court rejects Plaintiff's argument that the ALJ had committed legal error in her evaluation of the opinion from Dr. Gutierrez-Santiago.

## IX.    THE ALJ'S EVALUATION OF PLAINTIFF'S SUBJECTIVE ALLEGATIONS

Finally, Plaintiff contends that the ALJ erred in considering the consistency of her subjective allegations. (ECF No. 16:10-14). The Court disagrees.

### A.    ALJ's Duty to Evaluate Plaintiff's Subjective Allegations

Social Security Ruling 16-3p provides a two-step framework for the ALJ to evaluate a claimant's subjective allegations. SSR 16-3p, 2016 WL 1119029, at *2 (Mar. 16, 2016). First, the ALJ must make a threshold determination regarding "whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms, such as pain." *Id.*, at *2. Second, the ALJ will evaluate the intensity and persistence of the claimant's symptoms to determine the extent to which they limit an individual's ability to perform work-related activities. *Id.* At this second step, the ALJ will examine the objective medical evidence, the claimant's statements regarding his symptoms, information from medical sources, and "any other relevant evidence" in the record. *Id.*, at *4. In evaluating a claimant's subjective statements, the ALJ must "provide specific reasons for the weight given to the [claimant's] symptoms, [which are] consistent with and supported by the evidence, and [ ] clearly articulated" for purposes of any subsequent review. *Id.*, at *9.

21

**B.   No Error in the ALJ's Evaluation of Plaintiff's Subjective Allegations**

This Court's review of the ALJ's consideration of Plaintiff's subjective reports is guided by two principles. First, such "determinations are peculiarly the province of the finder of fact, and [the court] will not upset such determinations when supported by substantial evidence." *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995). Second, "findings as to [subjective reports] should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Id.* (additional alteration omitted).

Plaintiff begins her challenge to the ALJ's evaluation of her subjective allegations by setting forth the ALJ's summary of statements which had been made by Plaintiff in a function report and at the administrative hearing. (ECF No. 18:12). Plaintiff then acknowledges that the ALJ had deemed these statements "not entirely consistent with medical evidence and other evidence in the record." (TR. 448). According to Ms. Hendricks, the ALJ's finding "cannot stand" because "it is largely based on a faulty understanding of coarctation of the aorta." (ECF No. 18:12). Plaintiff then criticizes the ALJ's findings on Plaintiff's coarctation and points to evidence in the record which she believes ought have resulted in a different finding by the ALJ. (ECF No. 18:12-14). Once again, the Court reads Plaintiff's argument as nothing more than an attempt to re-weigh the evidence, which is improper. *See supra*. The ALJ fully considered the coarctation, including medical evidence relating to this condition prior to finding that Plaintiff's

subjective allegations were not entirely consistent with the medical and other evidence of record. (TR. 448). In doing so, the ALJ stated:

> Indeed, the claimant has a history of coarctation of the aorta, status post end-to-end anastomosis repair. On August 12, 2014, the claimant underwent cardiac catheterization with balloon dilatation and the area was recoarctated four times to a pressure of 6 atmosphere. Dr. Kimberling stated that the claimant would likely need balloon and stent placement in the future. On September 19, 2014, the claimant was seen for follow up wherein he was generally recommended to continue with regular follow ups. In addition, an echocardiogram on December 31, 2014, showed moderate to severe recurrent coarctation of the aorta without significant runoff. However, an echocardiogram on March 31, 2015, showed only mild recurrent coarctation of the aorta. Further, on October 2, 2015, it was noted that the claimant's coarctation was stable. Treatment records generally reflect the claimant was seen annually for routine monitoring.

(TR. 448). Plaintiff contends that "[a]n ALJ must articulate specific reasons for questioning a claimant's credibility." (ECF No. 18:12). The ALJ's reasoning demonstrates that she has fulfilled this duty. As a result, the Court rejects Plaintiff's challenge to the ALJ's evaluation of subjective allegations.

## X.    MISCELLANEOUS

In a final allegation of error, Plaintiff states: "The ALJ erred at Step Three and failed to consider the combined effect of all Claimant's medical determinable impairments." (ECF No. 18:15). The Court disagrees. *See* TR. 443 ("In making this determination, the combined effect of all medically determinable impairments, even those that are not severe was considered."). In this section, Plaintiff also states: "the ALJ simply failed to analyze Claimant's ADHD as a Listing." (ECF No. 18:15). Ms.

Hendricks fails to explain how or why D.C.H.'s ADHD should have been considered as a Listing and the Court will not entertain this perfunctory argument.

**ORDER**

The Court has reviewed the medical evidence of record, the transcript of the administrative hearing, the decision of the ALJ, and the pleadings and briefs of the parties. Based on the forgoing analysis, the Court **AFFIRMS** the Commissioner's decision.

ENTERED on September 29, 2023.

SHON T. ERWIN
UNITED STATES MAGISTRATE JUDGE